UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ALKEK & WILLIAMS LTD., and ALBERT AND MARGARET ALKEK FOUNDATION,<br><br>   Plaintiffs,<br>v.<br><br>TUCKERBROOK ALTERNATIVE INVESTMENTS, LP, TUCKERBROOK/SB GLOBAL SPECIAL SITUATIONS GP, LLC, and TUCKERBROOK/SB GLOBAL SPECIAL SITUATIONS FUND, LP<br><br>   Defendants. | CIVIL ACTION NO. H-08-3501 |

## MEMORANDUM AND ORDER

Pending before the Court is Defendants' Motion for Summary Judgment (Doc. No. 39). For the following reasons, Defendants' Motion shall be granted.

**I.  BACKGROUND**

Plaintiffs Alkek & Williams, LTD, and Albert and Margaret Alkek Foundation ("Plaintiffs") bring this action to address a disputed contract provision that they allege allows them to recover their capital accounts from an investment fund specializing in distressed assets. The vehicle, Defendant Tuckerbrook/SB Global Special Situations Fund, L.P. ("GSS"), a "fund of funds," was established in November 2007. (Pls. Am. Compl., Doc. No. 34, ¶ 8.) Defendant Tuckerbrook Alternative Investments, LP ("Tuckerbrook") serves as the investment adviser for GSS and the managing member of Defendant Tuckerbrook/SB Global Special Situations Fund GP, LLC ("GSS GP"), the general partner of GSS. (*Id*. ¶ 8.)

1

Tuckerbrook hired Sumanta Banerjee ("Banerjee") to launch and manage GSS. (*Id*. ¶ 11.) Banerjee was the 50 percent owner of GSS GP, controlled GSS GP, and was primarily responsible for the management of GSS's investment portfolio. (*Id*. ¶ 12; Defs. Mot., Doc. No. 39, at 3.) Pursuant to the Limited Partnership Agreement of GSS ("Agreement"), investors in the fund, like Plaintiffs, were given the automatic right to withdraw from GSS if Banerjee:

> dies, becomes incompetent or disabled (i.e., unable, by reason of disease illness or injury, to perform his functions as the managing member of the General Partner for 90 consecutive days), or ceases to be directly or indirectly involved in the activities of the General Partner. (Agreement § 5.03.)

(Pls. Am. Compl. ¶ 12.)

In a letter dated March 25, 2008 ("March Letter"), Tuckerbrook advised the limited partners that it had terminated its employment relationship with Banerjee. (*Id*. ¶ 14.) Plaintiffs claim that this letter triggered the special withdrawal rights in Agreement Section 5.03. (*Id*. ¶ 15.) Plaintiffs then exercised their purported withdrawal rights in a letter dated April 25, 2008, to be effective May 31, 2008.[1] (*Id*. ¶ 16.) Defendants did not act on Plaintiffs' withdrawal notice for several months, and continued to charge the GSS limited partners quarterly management fees for the remainder of 2008. (*Id*. ¶ 17.) During this time, Tuckerbrook was engaged in a legal battle with Banerjee concerning the circumstances and legal implications of his termination. Tuckerbrook then declared GSS to be in dissolution in January 2009. (*Id*. ¶ 21.)

Plaintiffs now bring claims for breach of contract because Defendants purportedly failed to return Plaintiffs' capital accounts and charged them management

---

[1] According to Plaintiffs, the Agreement allows any limited partner to exercise its withdrawal rights by giving notice within 30 days of learning of Banerjee's separation from GSS, effective at the end of the full calendar month after the notice date.

fees after May 31, 2008. Plaintiffs also seek a declaratory judgment that they withdrew as limited partners effective May 31, 2008, and an accounting and special audit required by Plaintiffs' alleged exercise of their withdrawal rights. Plaintiffs pray for a full recovery of their capital accounts as of May 31, 2008, management fees, attorneys' fees, and costs. This Court has jurisdiction pursuant to 28 U.S.C. Section 1332. In this Court's order denying Defendants' original summary judgment motion, this Court found that additional discovery was required to determine whether Banerjee retained "only nominal office holding authority" over GSS such that Plaintiffs' Section 5.03 rights were triggered, or whether Banerjee was involved with the activities of the GSS GP after the spring of 2008. (Doc. No. 23 at 7.)

## II.     LEGAL STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp*., 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id*. Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent

3

summary judgment evidence. FED. R. CIV. P. 56(e)(1); *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### III.   THE AGREEMENT

As stated above, the Agreement provides for withdrawal rights of GSS investors if Banerjee "ceases to be directly or indirectly involved in the activities of the General Partner." (Defs. Mot. Ex. 54, Doc. No. 39-5.) The Court previously held that the ordinary meanings of the phrase "involved in the activities" and the verb "involve" must be used. (Doc. No. 23 at 5.) In their Motion, Defendants offer a definition of "involve," purportedly from Merriam Webster Dictionary, as "to engage as a participant." (Defs. Mot. at 19 n.5.) Plaintiffs accept this definition in their response, and the Court will accordingly adopt it. (Pls. Resp., Doc. No. 40, at 2.) Thus, the parties appear to agree that Plaintiffs' Section 5.03 were validly exercised only if Banerjee ceased to directly or indirectly "engage as a participant" in the activities of GSS GP after his termination, a question purely of fact. As such, this Court is tasked with determining whether a genuine issue of fact remains as to Banerjee's involvement in the fund.

### IV.   FACTS AT THE TIME OF THE WITHDRAWEL NOTICE

Plaintiffs argue in their response that their withdrawal rights should be determined by the facts in existence at that time the withdrawal notice was issued, and not in the months thereafter. According to Plaintiffs, this Court should therefore consider only those

4

events that occurred between the date of the March Letter and the subsequent notice of withdrawal in evaluating their claim. (Pls. Resp. at 2.) Without making a conclusive determination as to the merits of this assertion, the Court will first consider the events that transpired between these two dates.

The March Letter sent to Plaintiffs as well as the other GSS investors reads: "Mr. Banerjee will no longer serve as portfolio manager [of GSS] . . . . Mr. Banerjee, however, will continue to be a managing member of the general partner entities for each of the Funds." (Defs. Mot Ex. 2, Doc. No. 39-3.) Two days after it was sent, Banerjee sent an email to GSS investors in response. In that correspondence, Banerjee clarified to investors that he maintained a 50 percent interest in the general partnership of GSS (as well as several other investment funds), and that the other 50 percent member, Tuckerbrook, "[did] not have any authority to act on [the fund's] behalf without [Banerjee's] consent." (*Id*.) Banerjee, through his counsel, also sent letter to counsel for GSS, informing it that Tuckerbroook had improperly taken unilateral action in terminating GSS former counsel and hiring new counsel. (Defs. Mot. Ex. 9.) Banerjee, through counsel, also contacted Michael J. Liccar & Co., CPAs ("Liccar Co."), the administrator of GSS, instructing it not to pay fees of any kind to GSS and other funds without Banerjee's permission. (Defs. Mot. Ex. 10.) Banerjee also contacted Citizen Bank, instructing that it copy Banerjee on all future communications with GSS and the other funds in which he was involved. (Defs. Mot. Ex. 17.) It is also clear that Banerjee was communicating with outside entities about acquiring Tuckerbrook's interest in GSS, thereby allowing Banerjee to continue as the portfolio manager. *See, e.g*., (Defs. Mot Ex. 44, Doc No. 39-4.) These communications suggest that, during the initial 30 days

following the March Letter, Plaintiffs had every reason to believe that Banerjee maintained involvement in the general partnership of GSS.

Plaintiffs do not dispute that, even after being terminated from Tuckerbrook, Banerjee maintained his titular position as 50 percent owner of GSS GP. However, in response to Defendants' evidence, Plaintiffs point to the fact that Banerjee, upon being terminated, was escorted by security out of Tuckerbrook's offices, and was prohibited from taking with him any books or records from GSS. (Turner C. Smith Dep., Pls. Resp. Ex. J, 86:19-87:23, Oct. 9, 2009.) They point out that Tuckerbrook then contacted the fund managers to inform them that Tuckerbrook had replaced Banerjee as portfolio manager and that Banerjee would no longer receive reports and statements through Tuckerbrook. (Pls. Resp. Ex. K.) Tuckerbrook also contacted Liccar Co. to inform it of Banerjee's termination, and to convey that Banerjee's approval was "no longer required for any wires or transactions of any kind" regarding GSS. (Pls. Mot. Ex. K.)

This evidence does present a somewhat conflicting image of the extent to which Banerjee maintained involvement in GSS's affairs after he was terminated. Notably, however, how Banerjee, Tuckerbrook, and other interested parties *perceived* Banerjee's role in GSS GP following his termination is not the determinative issue for this Court. The language of Section 5.03 of the Agreement is not written in terms of any one party's perceptions, assertions, or purposes and designs concerning Banerjee's involvement in GSS. Rather, this provision plainly states that its invocation is contingent on whether Banerjee in fact "cease[d] to be directly or indirectly involved in the activities of the General Partner." (Agreement § 5.03.) Therefore, what is material is whether Banerjee was, *in effect*, able to directly or indirectly exert influence over the management of GSS

6

following his termination. Accordingly, the Court now turns to evidence that speaks directly to this issue.

## V. BANERJEE'S EFFECTIVE INFLUENCE OVER GSS[2]

Plaintiffs argue that, despite Banerjee's efforts to maintain influence over GSS, he was "frozen out" of the information exchanges and the negotiations related to the fund. (Pls. Resp. at 8.) Tuckerbrook, however, provides evidence that Banerjee's authority was effectively exercised. Mr. Liccar, of Liccar Co., testified that following Banerjee's termination, he consulted with GSS counsel regarding the status of GSS control and its governing authority. According to Mr. Liccar, counsel notified him that Banerjee and Tuckerbrook were of equal authority, and therefore Mr. Liccar "required both parties to agree to any transaction" involving the fund before his company could perform it. (Michael J. Liccar Dep., Defs. Mot. Ex. 11, Doc. No. 39-3, 33:11-14, Dec. 14, 2009.) Liccar Co. refrained from disbursing Tuckerbrook's fees without Banerjee's approval. (Liccar Dep. 35:20-16:4.) Counsel for Liccar Co. informed Banerjee that Liccar Co., as administrator of the fund, would take direction from the general partner of the funds, including GSS, but "would not respond to or follow directions of the principals of the general partner." (*Id*. 41:10-19.) In other words, Liccar Co. was of the opinion that it could only act at the instruction of Banerjee and Tuckerbrook acting collectively as GSS GP, but not at the request of either of them individually. Mr. Liccar specified that transactions involving the funds only went forward if "both Mr. Banerjee and Tuckerbrook agreed." (*Id.* 41:20-42:15.) According to Mr. Liccar's testimony, when

---

[2] While the Court will attempt to focus its review of the facts to the time period between the March Letter and Plaintiffs' exercise of their withdrawal rights in April, the record is not always clear as to when certain events occurred. In addition, certain events that took place after the withdrawal notice was issued are illuminative of Banerjee's effective influence before Plaintiffs exercised their rights. As such, the Court will include evidence from after April 2008 in its analysis.

7

Liccar Co. received Plaintiffs' redemption request in April, Liccar Co. "would have forwarded it to probably both principals" requesting that they take action by either approving the request or not allowing it. (*Id*. 59:13-21.)When asked about one specific transaction, the "Peloton investment," Mr. Liccar testified that a request regarding this investment was sent to both Banerjee and Tuckerbrook, and that although Tuckerboork agreed, Banerjee withheld his approval until he was given further information. (*Id*. 71:4-72:11.) He did not recall whether Banerjee's approval ever came. Mr. Liccar went on to testify that, to the best of his recollection, Banerjee was not approving the release of management fees from the fund, and so they were not being released during that time. (*Id*. 75:5-13.) Liccar Co. also sent Banerjee a GSS financial report for the second quarter of 2008 for his review and comment. (*Id*. 95:5-11.) Finally, Mr. Liccar unequivocally stated that it was Liccar Co.'s belief that Banerjee was a 50 percent owner of GSS, *and that Liccar Co. treated him as such*. (*Id*. 134:2-7 (emphasis added).) In his deposition, Plaintiffs pointed out to Mr. Liccar that Liccar Co. was receiving conflicting information from Tuckerbrook and Banerjee about the nature of Banerjee's authority, as Tuckerbrook was explicitly representing to Liccar Co. that Banerjee had none. In response, however, Mr. Liccar stated that, because he was not in a position to resolve these conflicting representations, "the best [he] could do is get affirmation from both parties until the dispute was resolved one way or another." (*Id.* 136:8-20.)

Mr. Liccar's deposition is corroborated by several of the exhibits attached to Defendants' Motion. In one email sent from an employee of Liccar Co. to Tuckerbrook, Liccar Co. explicitly states that, for all wires for GSS and the related funds, "per our legal counsel, [Liccar Co.] would need approval of both co-managers of the General Partner of

8

each respective fund in order to process any wires." (Defs. Mot. Ex. 30, Doc. No. 39-4.) Notably, when Scott Seaman, a representative of Plaintiffs, was asked about his then current position as to whether Tuckerbrook could have acted with regard to GSS without Banerjee's consent during the period of time in question, Mr. Seaman stated that he did not believe it could have. (Scott B. Seaman Dep., Defs. Mot. Ex. 4, Doc. No. 39-4, 40:17-21.) Finally, an email sent from one GSS limited partner, Public Welfare, to another, reveals that the limited partners understood Banerjee to be actively involved in discussions as to whether GSS should approve redemptions for two hedge funds. (Defs. Mot. Ex. 19, Doc. No. 39-3.) The evidence presented by Defendants compellingly demonstrates that, even to the extent that Tuckerbrook might not have wanted Banerjee to maintain any authority regarding GSS, Banerjee did in fact exert his influence. His managing authority was indeed demonstrably deflated, and his termination appears to have compelled him to repeatedly assert his authority to the administrators of GSS. Nonetheless, Mr. Liccar testimony confirms that, following his assertion that he retained a 50 percent interest in GSS GP, Liccar Co. felt obligated to seek Banerjee's permission to act and to refrain from acting should this permission be denied. Banerjee thus remained both directly and indirectly involved in the management of GSS GP.

 The evidence offered by Plaintiffs is insufficient to create a material issue of fact as to this point. Plaintiffs point to several documents that suggest that Tuckerbrook represented to Liccar Co. that Banerjee had no authority over GSS and other funds, and that it tried to prevent Banerjee from acquiring books and records related to the funds at issue. (Pls. Resp. Ex. N.) However, nothing in this evidence refutes the fact that, despite these representations, Liccar Co., pursuant to discussions it had with its counsel,

9

continued to recognize Banerjee's authority and seek his permission to act. While Tuckerbrook tried to act unilaterally, it was notably unsuccessful in effectuating many of its plans while Liccar Co. was still seeking Banerjee's approval. Plaintiffs point out that Tuckerbrook unilaterally executed an Investment Management Agreement with the investors of GSS, which explained the rights and obligations of Tuckerbrook to the funds at issue including GSS. (Pls. Resp. Ex. O at App. B.) However, nothing in this act suggests that Banerjee, who was no longer affiliated with Tuckerbrook, could not have entered into his own Agreement with the fund investors explaining his obligations to them as a co-manager of the general partner. Furthermore, while it appears that Tuckerbrook did charge GSS management fees for the full duration of 2008 until the liquidation in January 2009, Mr. Liccar's testimony suggests that these fees could not actually be released without Banerjee's permission. (Liccar Dep. 75:5-13.) Similarly, with the financial statements that Plaintiffs claim Tuckerbrook issued unilaterally, Mr. Liccar's testimony confirmed that any release of financial statements without Banerjee's approval was a mistake, and was represented as such to both Tuckerbrook and Banerjee, because Banerjee should have been given the opportunity to comment. (Liccar Dep. 133:6-20.)

      Indeed, the evidence also demonstrates that, to the extent that Tuckerbrook attempted to get around the need for Banerjee's approval by seeking approval directly from the GSS limited partners, Banerjee was able to intercept and thwart these efforts as well. In an email to the GSS limited partners sent in May 2008, Banerjee asked the partners not to approve the GSS redemption from two investments, "MKP and Paulson," pursuant to Tuckerbrook's request, until they received further information from him.

(Defs. Mot. Ex. 18.) Banerjee ultimately recommended that the limited partners not approve the Paulson redemption, and it appears that they acted in accordance with this advice. (*Id.* Exs. 18-19.)

Even construing all evidence in favor of Plaintiff, the Court cannot find that a fact issue remains as to whether Banerjee was directly or indirectly involved, or "engaged as a participant," in the management activities of GSS. The evidence presented by Defendants irrefutably demonstrates that, during the relevant time period, GSS was being administered with the understanding that permission to act was required from both Banerjee and Tuckerbrook, and thus both parties had a direct hand in managing the fund.[3]

## VI. GDF REDEMPTION NOTICE

The Court does not find that a legitimate factual dispute exists as to whether Banerjee remained directly and indirectly involved in the activities of GSS even after his termination. Nonetheless, Plaintiffs argue that Defendants' own conduct during the period of time in question is contrary to the position they now take regarding the validity of the Section 5.03 withdrawal notices, and that this inconsistency creates an issue of fact.

Plaintiffs point out that all the limited partners, including the Global Distressed Fund ("GDF"), issued letters indicating they were exercising their withdrawal rights under Section 5.03 of the Agreement after Plaintiffs' exercise of such rights. (Pls. Mot.

---

[3] Defendants also present evidence suggesting that Plaintiffs were working with Banerjee in the months after his termination to find a party to buy out Tuckerbrook's interest in GSS. *See, e.g.*, (Defs. Mot., Doc. No. 39-5, Ex. 45, 46, 47.) This information does not, however, go directly to the question of whether Banerjee was effectively involved in the management of GSS as 50 percent owner with Tuckerbrook. This information is only relevant to the extent that it suggests that Banerjee was receiving information about the GSS fund through Plaintiffs and the other limited partners, and that Plaintiffs were aware of his *efforts* to exert his control over GSS. This Court considered and weight this information accordingly.

11

Exs. A-C.) Notably, the letter issued by GDF was signed by John Hassett, the managing principal of Tuckerbrook. (*Id*. Ex. A.)

### A.     Quasi-estoppel

Plaintiffs first argue that Tuckerbrook's prior position espoused in the GDF withdrawal letter estopps it from now arguing that Plaintiffs' withdrawal rights were not in fact triggered by Banerjee's termination.  In response to this argument, Defendants argue that the GDF redemption notice is not "inconsistent" with Tuckerbrook's current position that Section 5.03 was never triggered, because the notice does not "acknowledge the validity" of any of these redemption notices. (Defs. Reply,  Doc. No. 41, at 4.) They further argue that "neither Tuckerbrook, nor GDF, nor anyone else has ever substantively asserted [these notices] at anytime." (*Id*.) Finally, Defendants point out that Plaintiffs can cite to no evidence that Tuckerbrook "benefited or gained some unfair advantage" from its supposed prior inconsistent position, nor that Plaintiffs suffered any detriment from the notice.

Plaintiffs rely on *Albertson v. Winner Automotive*, 2004 WL 2435290, at *4 (D. Del. Oct. 27, 2004) for the proposition that "[t]he doctrine  of quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position that it has previously taken." (quoting *Bott v. J.F. Shea Co.*, *Inc.*, 299 F.3d 508, 512 (5th Cir. 2002)). The court in *Albertson* recognized that this doctrine prevents a party "from repudiating an act or assertion if it would harm another who reasonably relied on the act or assertion." *Id*. (quoting BLACK'S LAW DICTIONARY 591 (8th ed. 2004)). Quasi-estoppel applies when "it would be unconscionable to allow a person 'to maintain a

12

position inconsistent with one to which he acquiesced, or from which he accepted a benefit.'" *Id.* (quoting *Bott*, 299 F.3d at 512.)

The Court holds that the doctrine of quasi-estoppel does not apply to this case. The Court does not take a position on whether the issuance of the GDF redemption notice is "inconsistent" with Tuckerbrook's current position that Plaintiffs' redemption was invalid. However, the Court does note that, although Plaintiffs point to two letters issued by Tuckerbrook to the GSS limited partners referring to their recent redemption requests, both refer to these requests only in passing, and neither speaks to their validity. *See* (Pls. Resp. Exs. F, G.)[4] Furthermore, Tuckerbrook received no benefit whatsoever from the GDF redemption notice, because the redemption was never effectuated under Section 5.03. Indeed, Plaintiffs only learned of these redemption notices after initiating this litigation, indicating that they neither relied on GDF's supposed redemption request, nor were disadvantaged by it. *See Albertson*, 2004 WL 2435290 at *4.

Finally, Plaintiffs point out that, prior to this litigation, at no time did Defendants suggest in any of their correspondence that their Section 5.03 rights had not been validly exercised. (Pls. Resp. at 5.) However, that Defendants did not explicitly assert during the months of turmoil after Banerjee's termination that the withdrawal notices were invalid does not preclude them from doing so now, after Plaintiffs have filed a lawsuit. Indeed, Defendants provide convincing evidence that, although the limited partners all submitted Section 5.03 notices, extensive negotiations were taking place among all interested parties concerning the possible continuation of the GSS fund. *See* (Defs. Reply at 5.) As such, Defendants should not be penalized for waiting until now to raise the invalidity of

---

[4] Indeed, it is not clear to the Court whether Exhibit F to Plaintiff's Response, which is a list of recommendations sent by John Hassett to certain limited partners, was primarily intended for the limited partners of GSS or of GDF.

13

the Section 5.03 redemptions, and it appears that Plaintiffs purposeful assertion of this right was not demonstrated until the filing of this lawsuit.

### B. Genuine Issue of Fact

In addition to the quasi-estoppel doctrine, Plaintiffs also assert that Tuckerbrook's inconsistent conduct creates an issue of fact that should go before a fact-finder. In *Javelin Investments, LLC. v. McGinnis*, 2007 WL 781190, at *4-5 (S.D. Tex. Jan. 23, 2007), the case on which Plaintiffs rely, the plaintiff invoked four contradictory theories over the course of the litigation to show that she had ownership of the copyright at issue. The court there found that the plaintiff's "shifting positions over the course of the case [could] most charitably be construed as *generating* material fact issues." *Id.* (emphasis included). Here, in contrast, Tuckerbrook has consistently asserted since the inception of the litigation that Plaintiffs' Section 5.03 rights were not validly triggered. Moreover, even prior to Plaintiffs' filing of this case, Tuckerbrook never expressly acknowledged that the withdrawal notices were valid. Therefore, the case on which Plaintiffs rely is inapposite.

Moreover, through deposition testimony, Defendants explain why Mr. Hassett issued this notice of withdrawal on behalf of GDF, despite his purported belief that the notices were invalid. Mr. Hassett testified that "[his] decision to send [the GDF withdrawal notice] was so that there wasn't going to be any potential for [Plaintiffs] to have some priority" in redeeming their investment, and thus he sent the notice as a defensive measure. (John Hassett Dep., Defs. Reply. Ex. C, 42:11-25, Aug. 11, 2009.) Mr. Hassett testified that he recommended that the other limited partners do the same, and in so doing explicitly mentioned to them his belief that the notices were not valid. (*Id*. 43:2-21.) Plaintiffs offer no evidence to contradict this testimony.

Therefore, the Court cannot find that the GDF redemption notice issued by Tuckerbrook is sufficient to create a question of fact, particularly given the wealth of evidence demonstrating that Banerjee was exerting influence over the management of GSS. Accordingly, Plaintiffs' request for damages and for declaratory judgment concerning the validity of their exercise of the Section 5.03 withdrawal rights must be denied. Defendants' counterclaim for declaratory judgment must be granted.

## VII. DEFENDANTS' COUNTERCLAIM FOR ATTORNEYS' FEES

Defendants point out that Section 2.06 of the Agreement requires that the limited partnership indemnify and hold harmless the general partner for suits brought against GSS. Defendants, however, argue that equity demands that this indemnification come solely from Plaintiffs' shares of GSS, because Plaintiffs' claims are frivolous and asserted in bad faith. (Defs. Mot. at 20.) Defendants maintain that the evidence demonstrates that not only did Plaintiffs know that Tuckerbrook could not act unilaterally with regard to GSS, but that they fueled Banerjee's involvement by actively seeking out entities who could buy out Tuckerbrook's interest.

While this Court acknowledges that the evidence strongly suggests that Plaintiffs were working with Banerjee in an attempt to re-involve him in GSS management, much of the evidence presented by Plaintiffs suggest that, during the period immediately following Banerjee's termination, they were receiving conflicting messages as to the extent of Banerjee's involvement. Defendants' evidence, as presented to this Court, irrefutably establishes that Banerjee was able to exert direct influence over management and administration of the fund, however it is not entirely clear that Plaintiffs were privy to the communications between Liccar Co., Tuckerbrook, and Banerjee during this time.

As such, the Court cannot conclude that this lawsuit was brought in bad faith, or that it is appropriate to equitably allocate all of the costs to indemnify Defendants to Plaintiffs. Therefore, Defendants' counterclaim for attorneys' fees is denied, and the indemnification expenses will come from the entire GSS limited partnership, pursuant to Section 2.06 of the Agreement.

## VIII. CONCLUSION

Defendants' Motion (Doc. No. 39), is **GRANTED IN PART.**

1. Defendants are awarded summary judgment on Plaintiffs' claims for damages under breach of contract, declaratory judgment, and a special audit pursuant to their exercise of withdrawal rights;

2. Plaintiffs' invocation of withdrawal rights under Section 5.03 of the Limited Partnership Agreement is declared ineffective, as Defendants have show that the events triggering such rights had not occurred. Accordingly, GSS is now properly in the process of liquidation pursuant to Section 6.01 of the GSS Limited Partnership Agreement;

3. The limited partners, including Plaintiffs, will indemnify Tuckerbrook, as general partner of GSS, to the maximum extent permitted by law, pursuant to Section 2.06 of the GSS Limited Partnership Agreement.

**IT IS SO ORDERED**.

**SIGNED** this 17th day of March, 2010.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE